Do we have Mr. Koppel? There he is. Hello. I'll call the next case. Case number 21-8046 Northern Arapaho Tribe v. Becerra. Mr. Stromer. Good morning, Your Honor. May it please the court. Jess Stromer representing the Northern Arapaho Tribe in the case. The Indian Self-Determination and Education Assistance Act was enacted by Congress close to 40 years ago to allow tribes to step into the shoes of the Indian Health Service and take over certain federal programs for Indian people, along with the related funds that the Indian Health Service spent on those programs. The Indian Health Service primarily funds its federal programs with two pots of funds, funds that are directly appropriated by Congress for that purpose, and third-party revenues that the agency generates. In addition, the Indian Health Service has access to services that are provided by various agencies of the federal government, like OPM, GSA, and DOJ. Those agencies carry out and absorb the cost of administrative responsibilities that are necessary for the Indian Health Service to properly deliver federal programs. Several years after the act was enacted by Congress, Congress recognized that when tribes take over these federal programs from the Indian Health Service, they don't have access to the administrative functions that these other agencies carry out for the IHS. Instead, tribes were forced to cannibalize program funds to pay for these administrative costs. As a result, programs decreased. To fix this problem and to ensure that tribes were treated the same as the Indian Health Service, Congress added provisions to the Self-Determination Act in 1988 and 1994 that allowed tribes to be paid an additional sum of money, known as contract support costs, that covered these administrative costs. Contract support costs is made up of two types, direct and indirect. The IHS and the tribes generally calculate a tribe's indirect entitlement by first identifying the federal program's funding amount, which is known as the funding base. A cost rate is negotiated with a constant agency and then multiplied against that funding base. The result of this calculation yields the total amount of indirect contract support costs that a tribe is entitled to be paid. The question is, Counsel, isn't this mostly covered in your briefs? I mean, you're giving us a history lesson, which I can assure you we've probably read. I've got a question I need to get straight to the problem with this. Explain to me exactly what it is, the cost that you're claiming that you were entitled to. And I'm asking for it in layman terms. I want to know what it is that the government denied the claim that you're asserting that they denied that you were entitled to. So, the costs that the government has denied, Your Honor, are the amount of administrative costs that the tribe absorbs when it provides additional services under the federal programs that it has assumed from the Indian Health Service, using the third party revenues that the tribe generates, pursuant to the contract, and then is required by statute to spend back on the programs related to the contract. Okay, so let me make sure. In other words, let's say, for example, that Medicare pays them $10. Now, the tribe, as I understand it, is claiming that that $10 is a cost that they're also entitled to be reimbursed from the government. No, Your Honor, but that's a good question. Using your example, if a tribe received $10, our position is that Congress intended and the statute should be read in the manner Congress intended, is that the full $10 be spent on actually delivering services to the Indian beneficiaries. That's how the IHS would spend the dollars, and that's how tribes should be able to spend the dollars. On top of that $10, it should be entitled to the administrative costs. So if that's an additional $2, then that's what it is, whatever the formula yields when you calculate and contract support costs. So your claim is for $12 instead of just $10, which includes the $10. The $10 we're not claiming, Your Honor, because the tribe goes out and gets the reimbursement in third party revenues. It's the $2 that the IHS has been unwilling to pay, which we believe the statute requires the agency to pay. So is it, can I clarify, are the CSC costs with respect to the reimbursable, the third party income, program income, the CSC costs are kind of across the board. It's collecting, it relates to the billing, the collecting, the procedures and the structure they have to put in place to collect, as well as once they receive the program income, it's also any cost related to expending that income. That's correct, Your Honor. So it's across the board. It's all of the administrative functions associated with the third party revenues that are necessary for the tribe to be able to carry out the program in a manner that allows the tribe to spend 100% of the third party revenues on program services as the statute contemplates. I want to be sure, too, that we all understand that the district court dismissed this under a 12B6. Is that correct? That is correct, Your Honor. All right. That is correct. Well, we think the district court made four fundamental errors that warrant reversal of the decision. First of all, and very importantly, the court didn't apply this court's formulation of the Indian Canada of construction. The 10th Circuit has a well-established framework for interpreting the Self-Determination Act that places a heavy burden on the IHS to show that their interpretation of the act is compelled and the tribe's interpretation is unreasonable. As this court and the Supreme Court have made clear, liberal construction guides the court's inquiry into Congress's intent from the beginning of the analysis. It doesn't merely break a tie if a court concludes that two parties' interpretations are equally plausible. In this circuit, viewed through the lens of liberal construction, if the tribe's interpretation of the act is reasonable, then that's the end of the inquiry. The district court's opinion ignores these precedents and was presented with two competing but plausible interpretations of the statute. It chose to adopt the IHS's. The court also mistakenly imposed on the tribe a non-applicable burden of proof for establishing facts, not for interpreting laws. Just some clarification here. We may be talking about the same thing. It seems that the government suggests that if the statute is unambiguous, and in their view it is, that you don't ever reach essentially that liberal rule of construction. I think what you're saying is we don't really ask the question, is the statute ambiguous or isn't it ambiguous? Simply applying the liberal rule of construction, we ask whether the tribe's interpretation is reasonable. Is that correct? That's correct, Judge Morton. Struggling to see exactly how it is that it should be applied. No, that's correct, Judge Morton. You explained it exactly how we view the Salazar v. Ramo Navajo chapter decision that the Supreme Court upheld in 2012. That's exactly the formulation. If the tribe's interpretation of the statute is reasonable, that ends the inquiry. And it's not based on any ambiguous provisions in the statute or conflicting provisions and reading those provisions together. If our interpretation is reasonable, that's the end of the inquiry, in our view. Could you focus then on what the particular provisions of the statute that we're looking at here and why your approach or interpretation is reasonable? And I'm looking now at U.S. 25, USA 53, 25, A, 2, and 3, I suppose. I would be happy to do that, Your Honor. So 53, 25, A, 2, and 3 are read by the government and the district court agreed with this reading as limiting the types of funds that the secretary uses to carry out the program or the federal program to those that Congress has appropriated and does not include third-party revenues. The IHS in its briefs refers to the secretarial amount or the appropriated funding amount. Those terms don't show up at all in the statutory language. The relevant terminology in 53, 25, A, 1 is that the funds shall not be less than the appropriate secretary would have otherwise provided for the operation of these programs. Well, we know it's a fact that the secretary spends third-party revenues as well as directly appropriated funds when it carries out the program. If it's not a self-determination, if there's no self-determination contract, the secretary gets the reimbursed, receives the third-party reimbursements, the program income, and the secretary would, any cost related to that would be absorbed either by the secretary or by some other agency, I presume. No costs. If there were no self-determination contract and the secretary is running a program, no costs would be absorbed by the tribe on that supplemental third-party income. Is that what you're saying? That's correct. In a direct service environment where the secretary is running the entire program, the secretary has access to two pots of money, the appropriated funds that Congress makes available for the program, and the secretary is also obligated to go out and generate third-party revenues. There's a very complicated statutory scheme that Congress put in place to encourage and to give the secretary unique rights of recovery for third-party revenues for the sole purpose of adding those revenues to what Congress recognized is an insufficient amount that it appropriates to provide services to Indian people. So the secretary uses both sources of funding. And in our view, there's nothing in this statute that distinguishes those two streams of revenue. In subpart 5325A1, it talks about operation of the programs. In subpart 5325A2, it talks about the program. What about the reference to the contracted program? Does that make any difference since the contract, the self-determination contract, does that really relate to the appropriated funds? Well, we think that reference helps our position, Your Honor, because the contract itself in this case specifies that the tribe is required by the contract to have in place the necessary administrative structures to be able to build third parties. Now, the government would have you believe, well, that doesn't require the tribe to go out and build third parties. That's a stretch in my view. If the government's going to require you to have third-party billing capabilities, including accreditation, certifications, auditing, et cetera, all of those complicated administrative elements, it clearly intends you to go out and bill. And certainly the tribe goes out and bills like every other tribe. If you didn't bill, let's say you took the government's approach and you had to have all these things in place so that you could bill, but you didn't bill, you would simply be out the third-party income. You're not going to get it some other way, right? That's correct. And not only would the tribe be out of the third-party income, it would be out of the funds that it spent to build the infrastructure that it's not using to build because it's required under the contract to have that infrastructure in place. And once it does bill and receives the third-party revenue, the statute requires the tribe to spend all of that revenue back on the program. So it's not a bonus or additional money. It has to be spent on the program itself. Okay. So that's why in connection with your question, Your Honor, our view is that the contract actually supports our position because it requires the tribe to take the steps necessary for the tribe to be able to bill and then collect and then spend these resources, just like the IHS does in a direct service environment, back on the program. What about... Oh, go ahead, Your Honor. I'm sorry, you wanted to say... I was going to reserve the rest of my time, but please, I'm happy to answer questions. No, that's fine. That's fine. Okay, thank you, Your Honor. Does anyone else have questions before he reserves his time? Thank you. Mr. Koppel. Thank you, Your Honor. May it please the Court. I'm representing the Apalis, Secretary Becerra, and the Indian Health Service Director in the United States. At the outset, I'd note that Mr. Stromer didn't mention the D.C. Circuit's relatively recent decision in the Swinomish case, which decided this very issue and agreed and decided it in the same way that the district court did in this case. And what the D.C. Circuit emphasized in Swinomish was that there are multiple potential funding streams available. And under the ISTA, under plaintiff's contract and the statute, the only stream that is eligible for contract support costs is the funding provided by IHS itself. That's the crux of the matter. The statute doesn't contain any formula for contract support costs. They are essentially agreed to by IHS and the tribe, and the contract support costs consist of two components, as mentioned. Counselor, I'm not quite following your argument here, but I need to back up real quick when you cite the D.C. Circuit, however you pronounce it. Did that court consider the 5321G provision that's really important in this case? I don't believe it did. I'm not certain whether it cited 5321G. However, it did address. It's not. I can assure you it is not. So that's why, even though you cite that case to us, they don't even consider the argument that's being raised right now by the tribe. Well, yes, Your Honor, they do, but they consider it. I'm talking about 5321G, Counselor, not the whole. They don't consider that. It's not even raised, I don't believe. But 5321G is the Indian canon, the liberal construction principle, and they do address. The D.C. Circuit does indeed address that point. And it holds that the canon doesn't come into play where the statute is unambiguous as it is here. We fundamentally disagree with what the tribe is arguing regarding the Indian canon. It's clear from the from this court's decision in the Southern Ute case and the Supreme Court cases that we've we've decided that we've cited in our brief, the Chickasaw Nation case and the the Catawba tribe case that the the Indian canon only comes into play where the court is unable to discern. I look at it. It's not it's not a construct. It's what it is. It's a statutory construction, not not a canon of construction. This is strictly laid out in the in the statute as to the theory as to how you review or look at these contracts. That's not a canon. That's a statute. Well, Your Honor, but the canon is simply is simply incorporating or the statute is simply incorporating the canon and there and there's no. Therefore, there's no there's no distinction there. And the both I believe the statute itself also refers to to the principle coming into play when there is ambiguity in in in the statute. And they're simply as the district court here held in as the D.C. circuit held in Sonoma. There is no ambiguity. So you I think you and I are in disagreement because as I look at the statute, it says shall be liberally construed. That's not a canon. That's how you that's my statute. How you construe that you construe it by law, by statute, liberally. You agree. I certainly agree that the that the liberal construction, that the that the that the Indian canon is incorporated here. But that but the liberal construction itself only comes into play in the event of ambiguity. Where the big argument lies today. Right. That is certainly a critical a critical point. And as I said, I believe that the that that fifty three twenty one G also goes on to mention the mention the concept of ambiguity and and the principle coming into play when the when there is ambiguity. So in there, have you diagrammed that sentence? I sure didn't. But I can see right now we're probably going to have to go back to ninth grade English and diagram that sentence. Well, your honor, I while I haven't I haven't actually diagram that the way the way we the way we interpret that sentence is that sort of the when it refers to liberal construction and then it and then mentions, you know, in the event of ambiguity afterwards, they are the two the two concepts are in conjunction. And when one isn't one is not applying the the the the liberal construction canon at the outset to determine congressional intent. Well, I'm sorry. Well, I guess I'd like you to address. Does this really matter is all this for for nothing. This discussion about the the the liberal construction. What why isn't this statute ambiguous? Why isn't it? Well, and if it is, why isn't it reasonable to interpret it in the manner in which the tribe is interpreting it? Your honor, in our view and in the D.C. circuit's view and in view of the great majority of district courts have decided the case, it is not. There's not speaking of there's the D.C. circuit case and then there's a district court opinion going against the government in in New Mexico. It's fairly detailed and there's just one other that I think you cited one other district court. There's not a lot of not a lot of cases out there at this point on this. No, that's true, your honor. There are there. There is a district court decision in Swinomish, which was affirmed by the D.C. circuit. And then there is the San Carlos case, which is on appeal to the Ninth Circuit. And and and, you know, and then there is there's there's this case where we won blow and then there's sage. And so it's three out of four district courts and the D.C. circuit. But again, it's it's not simply a question of numbers. The statute refers it. It it refers to the contract as the D.C. circuit held and its focus is on the contract. And it is not on program income. Excuse me. What section in particular are you referring to right now? We're referring to to a two and a three. The none of neither of those provisions. What was anything about program income? Excuse me, your honor. I didn't hear you in response to Judge Moritz. What statute you specifically referring to? It's fifty three, twenty five, a two and a three. Which have to be read in conjunction also with a one, which is the secretarial provision. But the focus of all of those provisions is on the contract, the contract between IHS and the tribe. Focus on a let's talk about a two. It talks about contract support costs, CSC, which is what this is all about. That are carried on to ensure compliance with the terms of the contract and prudent management. Why when the contract specifically requires them to set up the billing system, the third party billing, would it not be and be certified and have everything in place to do that? Why would it not be prudent and pursuant to the contract for the costs that are expended in connection with that third party income to be recovered? Well, your honor, it is still it's still the tribe's choice and it also relates. But explain how it could possibly be the tribe's choice. Whether or not to proceed once they have all the everything in place, they'd be out. This income is what the tribe says if they went with the government's approach of, well, we've got all this in place. But. But we're not going to we're not going to seek this income. That's just nonsensical at this point. It's pursuant to the contract. Well, clearly, your honor, it is it's in the tribe's interest to do it. But the contract doesn't does not impose an obligation on the tribe to do it because that would that could in itself cause cause problems for the tribe. I'm not sure that really matters in terms of whether these contract support costs are being incurred and ensuring compliance with the contract. I'm just not following that. But you're in a place else where the that it makes clear that that the contract somehow. Would exclude costs related to third party income. Well, the statute distinguishes between between contract funds and and and program income. And where where are we now in this connection? What are we talking about? Two or three? Well, the key point here is that it doesn't mention program income at all in a one through three. Right. Right. Program income only is referred to in fifty three. Twenty five M and fifty three eighty eight J, which make it clear that it's supplemental to to the funding that the that the tribe receives under under under a one. Isn't that exactly the point that the tribe makes is that that this section, this entire section fifty three twenty five, which controls the amounts of the funds to be provided, doesn't refer doesn't exclude it to program income costs or to income that's appropriated from the agency. It refers to the federal program. And certainly these funds are part of that federal program. Your Honor, why isn't that a reasonable interpretation? Your Honor, the funds are used for program purposes, but that does not make them contractual funds, doesn't make them part of the contract. And the the court, the Congress has has created a system regarding program income, which is certainly which benefits the tribe by by enabling it to to provide additional additional services. But it doesn't follow from that, that the that it's entitled to additional contract support costs on on those services. So the idea, though, that the this the whole point of CSC costs is that the tribes should not be punished or penalized for for deciding to enter into these self determination contracts. They should not be penalized by having to expend costs. They wouldn't expend it. The agency were directly providing the services. Well, your honor, they're not being penalized. They're actually they're getting a benefit here because they're getting the additional funding through program income that they also receive that additional program funding. Don't they get that if whether it's self determination contract or it's through the through a direct service? Wouldn't wouldn't they also receive the third party reimbursements and would they have to expend funds cost related to that somehow? Well, your honor, I mean, there there's again, there the program is designed to to establish relative parity between right between IHS and and and the tribes. And how are you doing that here? Because it works the same way for both IHS and the tribes under 16 under 16, 41, 25, USC, 16, 41, C and D. And both of both that there's no requirement or there's there's no prohibition on on the on IHS or on the on the tribes from from use from expending these these expending program income on overhead. And and they both do. And that is the sort of that is the parity, the parity principle at work, the the both both IHS and the tribes can plow back the money into the program. But it's the it's it is not just not not simply the services themselves, but also overhead costs and administrative costs. Thank you. Your your time is up unless anyone has. I have I have one council, one question for counsel. You agree that this that the district court dismissed this on 12B6. Is that correct? That's correct, Your Honor. And what is your under that? What is your understanding of our standard of review? It's de novo. OK, well, I'm just listening to the discussion between you and Judge Moritz. I was beginning to think there's a whole new meaning to ambiguity. So thank you, counsel. Thank you, Your Honor. I urge the court to affirm the judgment of the district. Thank you. Thank you, Mr. Stromer. I'll just make a few points. First, I want to pick up on the last exchange between you, Judge Moritz and Mr. Koppel. And it's clear that there is a penalty. I mean, using the $10 example that Judge Baldock used earlier, if the tribe is carrying out the program and generates $10 in third party revenues under the government's view, the tribe has to cannibalize that $10, use $2 of it to pay for the overhead necessary to deliver the programs. Under the government's direct service environment, however, the government would spend the full $10. It has all of the administrative infrastructure, OPM, Department of Justice, all of the administrative infrastructure that is in place. That's clearly not what Congress intended. With all of these contract support cost provisions, Congress intended that tribes be on an equal footing with the government when it carries out these programs and is able to deliver the same bang for the same buck. And that's clearly not what the government's position leads to. And finally, I'll just make a comment about the Federal Circuit's decision in Swinomish. The circuit's decision is paltry at best in terms of its rationale for its position. Strikingly, the decision doesn't discuss Judge Browning's decision in the Sage Memorial case, which is the case in this circuit where a judge has actually spent the most time actually deeply analyzing all the provisions at issue in which he concluded that third party revenues should be part of the recurring base. So I would submit to the court that the Swinomish Federal Circuit decision is just flat wrong. And analytically, it certainly does not approach the issues at hand in the way that this court's precedents, I think, direct this court to do so. Thank you very much. And we appreciate your time and urge you to reverse the district court's decision. Thank you, counsel. Thanks to both.